Catskill Bank     Judgment for plaintiff on demurrer; leave to rejoin on
v.          payment of costs.
Stall.

---

### CATSKILL BANK *vs.* STALL & others.

Where the name of a firm is affixed to negotiable paper by one of the members thereof, *for the accommodation of a third person*, and the note is discounted by a bank without knowledge of such fact, the other members of the firm are bound, although the note is given out of the course of the partnership business, and without their knowledge and assent.

Where a *notice of protest* was sent per mail to a *town* designated by the agent who procured the discount of a note at a bank, in answer to an enquiry made by the cashier at the time of the discount, *such notice was held sufficient*, although there happened to be *four post offices* in the town. and the post office of the name of the town was *nine miles* distant from the residence of the endorser, while another post office in the same town was kept at the very place where he resided.

THIS was an action of *assumpsit*, tried at the Greene circuit in October, 1833, before the Hon. CHARLES H. RUGGLES, one of the circuit judges.

The suit was brought upon a note, made by one *Edward Shook*, for $1000, dated 20th February, 1833, payable sixty days after date to the order of *Jacob I. Stall & Co.*, and endorsed in the *name of the firm* by *Henry Teats, junior*, one of the members of the firm, which consisted of Jacob I. Stall, Henry Teats, junior, and John J. Traver. The note was discounted by the bank, and when due it was protested for non-payment, and notice of protest sent per mail. *Jacob I. Stall* alone defended, and rested his defence upon two grounds: 1. That the note was made, and the name of the firm subscribed to it for the *accommodation of the maker*, without his knowledge or assent; and that, consequently, the name of the firm being pledged in a matter not relating to the business of the firm, the plaintiffs were not entitled to recover; and 2. That *due notice* of non-payment had not been given. As to the *first ground of defence*, it appeared, that the note was

drawn and endorsed for the sole benefit of the *maker*, who received the whole avails of it; that *Teats*, who endorsed the name of the firm, was the *brother-in-law* of the maker; that *Traver* took an interest in procuring the note to be discounted, and that *Stall*, the partner who defended the suit, knew nothing about the transaction. One *Reynolds* was employed as an agent to procure the note to be discounted, who proceeded to Catskill and offered the note to the cashier for discount, saying he wanted him to do a note of *Shook's ;* but he could not state what he told the cashier as to *whom the money was for*, though he said he did not tell him that *Shook* wanted the money. The note was discounted, and the avails paid to Reynolds, from whom it passed to the *maker* of the note. *Traver* told Reynolds he wanted part of the money, and it appeared that the maker let him have $200 of it, which however he repaid in the course of a few days. As to the *notice of non-payment*, the following facts appeared : when the cashier took the note, he inquired of *Reynolds* who the firm of Jacob I. Stall & Co. consisted of, and witness told him who they were, where they lived, and where their store was ; that the store was at *Jackson Corners* where *Stall* lived, and *Traver* resided on the wharf at *Red Hook.* To the enquiry of the cashier, where he should direct his letters if he should wish to write ? Reynolds told him that by *directing letters to Red Hook*, they would get them sooner than if directed any where else. The notice of non-payment was directed to *John I. Stall & Co.* at *Red Hook*, and sent per mail the day of protest. There are *four post-offices* in the *town* of Red Hook, viz. *Upper Red Hook post-office*, at the upper village ; *Tivoli*, at Upper Red Hook landing ; *Barry town post-office*, at Lower Red Hook landing ; and *Red Hook post-office*, at the village of Lower Red Hook. Traver resided in the winter of 1833, at the *Upper Red Hook Landing*, the post office at which place called *Tivoli*, is nine miles distant from the post office called the *Red Hook post office.* The judge charged the jury that if the cashier enquired of Reynolds as to the residence of the defendants, and what place was nearest and most proper to direct a notice to and was informed by him that, *Red Hook* was such place, it was, under the circumstances, sufficient

diligence on the part of the holders of the note and that the notice sent to Red Hook was sufficient to charge the endorsers. And upon the other point, he instructed them that *if the plaintiffs had any knowledge* that the note was endorsed by *Teats* without the knowledge of *Stall,* for the benefit of another person, they could not recover ; but that the plaintiffs, being the holders of the note as negotiable paper, were entitled to recover against the defendant *Stall,* if they received the note *in good faith,* without knowledge that Stall had not assented to the endorsement, although it was endorsed by one of the partners in the name of the firm, without his knowledge or assent, and for the accommodation and benefit of the drawer alone. The defendant excepted to the charge. The jury found a verdict for the plaintiffs. The defendant asks for a new trial.

*C. Bushnell,* for the defendant.

*M. T. Reynolds,* for plaintiffs.

*By the Court,* NELSON, J. There is nothing in the testimony or upon the face of the note, disclosing to the plaintiffs that the endorsement of the firm of which the defendants are members, was made for the accommodation of the maker. On the contrary, the note being made payable to the firm, the fair inference is that it passed out of their hands in the usual course of business. The plaintiffs are *bona fide* holders for full value, according to the proof ; and the firm is therefore liable, though its name was used out of the partnership dealings, and without the knowledge or assent of one of its members. 7 *Wend.* 158. *id.* 309. 14 *id.* 133. *Chitty on Bills,* 30. 7 *East,* 210.

The only question of any doubt in the case is, as to the sufficiency of the notice of the dishonor of the note. We have seen that we must consider and decide this case as if the endorsement of the firm had been made in pursuance of proper authority, and that the defendants are legally liable upon due notice, the same as if the note had been made in the regular business of the concern ; and in such case, upon

general principles, as well as upon adjudged cases on the point, notice given to *one* of the partners is sufficient. *Chitty on Bills*, 230. 1 *Maule & Sel.* 259. 12 *East*, 317. 1 *Campb.* 82. The holders must use ordinary diligence in ascertaining the place of residence, or of business of the endorsers and in giving notice of the dishonor of the note, either personally, or by due course of mail. Any laches in this respect will discharge the endorsers. The question of diligence is a mixed one of law and fact, and should be submitted to the jury. 8 *Johns. R.* 177. When there is no dispute about the facts, it is a question of law. 11 *id.* 187. In the case of the *Bank of Utica* v. *Davidson*, 5 *Wend.* 587, the notice was directed to the defendant, at Bainbridge, Chenango county, and sent per mail; it turned out that he had removed some few months before to Masonville, Delaware county. The agent of the maker, who presented the note to the bank for discount, informed a clerk that the defendant lived in Bainbridge, and the clerk made a memorandum of it, according to custom. There was a post-office near the residence of the defendant, and the one in Bainbridge where the notice was directed, was 12 or 14 miles distant. This court adjudged the notice to be sufficient, and considerable stress was laid upon the information given by the agent, on the ground that his relation to the parties to the note authorized a reasonable confidence in his representations. There were other considerations referred to and relied upon, but this was the leading one. The case under review is much stronger on this point. *Reynolds* was sent to the Bank by *Traver*, one of the defendants, who had some interest in the note; at least, he told him he wanted part of the money, and afterwards received $200 of it, though it was subsequently repaid to the maker. Under these circumstances, we are of opinion it was proper for the judge to advise the jury, that if Reynolds gave direction concerning the place where letters should be sent to reach the endorsers, in the shortest time, that the bank were justified in trusting to the information, and directing them accordingly. Clearly, Traver himself ought not to be permitted to set up that the messenger whom he had sent to the plaintiffs to get the note discounted had misled them. The cashier had made full and particular enquiries of

NEW-YORK,
May, 1836.

him, and the weight of the evidence is with the verdict of the jury, that he was advised to send to *Red Hook*, as letters would be most speedily received by the defendants from that place. We do not intend to say that the information derived from the agent of the makers, who presents the note for discount, is, alone, sufficient diligence on the part of the bank in ascertaining the residence of the endorsers; application may undoubtedly very properly be made to him for such information; but here the messenger was sent by one of the defendants, and as to all the information reasonably and customarily sought for by the bank, in such a transaction, may be looked upon as standing in his place. If Traver himself had given it, there would have been an end of the question.

The case operates harshly upon Stall, as he had no knowledge of, nor his house any benefit from the note; both his partners, however, were privy to it; one endorsed, and the other procured the discount, and they are clearly responsible to him for the amount of this recovery, together with costs and charges.