April 19, 1909.

————o————

## No. 4616.

### Court of Appeal, Parish of Orleans.

### ST. MARY BANK AND TRUST COMPANY VS. J. D. SIMS AND SONS.

The borrowing of money and negotiation of bills and notes being incidental to and usual in the business of copartnerships formed for the purpose of trade, it follows that when a corporation borrows money professedly for the firm, and executes therefor a negotiable instrument in the copartnership name, it will bind all of the partners, whether the borrowing were really for the firm or not, and whether he diverts and misapplies the fund or not, provided the lender is not cognizant of the intended fraud. And the burden will not be thrown on him to show that he was not cognizant of such fraud, or to prove value given for the paper.

Appeal from the Civil District Court, Division "B."

Hall & Monroe, for Plaintiff and Appellee.

P. H. Mentz, for Defendant and Appellant.

MOORE, J. This was a suit against one of the joint makers of a promissory note. The answer is that the defendant's firm name was signed to the note by one of the members of the firm "without the knowledge or consent of any other member of said firm; that this act was never approved or ratified by said firm or any other member thereof; that said firm derived no benefit or advantage from the maker of said note; that no member of firm ever derived any benefit or advantage from said act; that said note was not drawn by said James M. Simms (one of the members of the defendant firm) for the benefit of said firm, but for the sole benefit of Walter Fears, who also signed said note, and to whom was paid by the St. Mary Bank

—311—

the entire sum loaned upon said note, said note being drawn for the sole purpose of securing a loan to said Fears for the sum mentioned in said note; that said James M. Simms signed the name of the defendant firm to said note as security for said Fears without the authority from or subsequent ratification by said firm or any member thereof; that the whole transaction was out of the usual course of business of said firm, whose personel and business were well known to the said payee and its officers and managers.''

There is a demand in reconvention for damages sustained by reason of the running of a foreign attachment by the plaintiff against the defendant firm in the Parish of St. Mary, which attachment was subsequently dissolved.

There was judgment in favor of the plaintiff on the main demand for the amount sued for, and against plaintiff and in favor of defendants on the reconventional demand, for the sum of $150.00, and from this judgment the defendants appeal.

It appears that the defendant firm is a trading co-partnership, and is composed of J. Dallas Simms and his two sons, James M. Simms and Samuel A. Simms. The note is dated New Iberia on the 10th day of July, 1903; is payable six months after its date to the order of the St. Mary Bank, is for the sum of $1,550.00, with 8 per cent per annum interest from its date until paid, and 10 per cent attorney's fees, and is made payable at the New Iberia Bank, in the town of New Iberia. It binds the makers in solido, the said makers being Walter Fears and the defendant firm, both of which makers are shown to be well known dealers and traders in mules in the parishes of Iberia and St. Mary, and the adjoining parishes.

Several days prior to the date of the note, Fears called at the St. Mary Bank in the town of Franklin, and inquired of the officers thereof whether the Bank would discount a note signed by him and the defendant firm. Being answered that the Bank would do so if it were a solidary note, Fears departed, and several days later returned with the note in question, the defendant firm's signature thereto, as joint makers, being affixed by James M. Simms. The note was then discounted and the net proceeds paid over to Fears.

The cashier of the Bank, Mr. R. Emmett O'Neil, with whom this transaction was made, testified that he knew ''that Fears

was doing a good deal of business with Simms, buying mules and selling mules in New Iberia,'' and ''that they were doing business together.''

Before the maturity of this note this witness said that he heard through Mr. Sam Simms (one of the members of the defendant firm) that Fears had some trouble and had disappeared from the town of New Iberia, whereupon he informed Sam Simms that there would be ''no occasion to notify Mr. Walter Fears at New Iberia (as to the maturity of the note) and that he then and there notified Sam Simms that the note in question ''would be due on this date, January 10th, 1904.''

He further testified ''that Sam Simms made no reply to this notification except that he acquiesced in the fact that the note was to mature then.'' (He) made no comment on it.

When the note matured and was not paid, the President of the Bank called the Cashier's attention to this fact and requested him to see Mr. Sam Simms about the matter, which the Cashier did. He informed him of the fact that the note was past matured and not paid, and requested him to make arrangements to take it up. Sam Simms answered that he would telephone to his father who was then in New Orleans. Returning a few moments later Sam Simms informed the Cashier that his (Sam Simms) father, the senior member of the defendant firm, wanted to talk to the witness (the Cashier) over the long distance phone. Here is what the latter testified to as to his conversation: ''Mr. Simms (J. Dallas Simms) seemed to be very much excited and opened the subject of this Fears note by saying that this note was a forgery, and that he didn't propose to pay it. I told him I didn't think it was a forgery, that I believed the signature was all right. He says that Jim never signed a note for that amount. Well, I says, Mr. Simms, did Jim sign a note for any amount? He said Yes, he signed a note for $350. I said, Mr. Simms, can you tell me the date of that note? He said, Yes, and he gave me a date corresponding with this date, July 10th. I said, Mr. Simms, don't you think Mr. Jim Simms may have been fooled when he signed that note? He says, I don't believe Jim is a fool. I says, I don't mean to say Mr. Jim Simms is a fool, but don't you think he might have been signing a $1,550 note when he thought he was signing a $350 note? He said, No, that he hadn't seen this note; that he

—313—

didn't intend to pay it. That that damned son of a bitch (meaning Fears) beat him out of $15,000 and he didn't propose to lose any more money by him."

Sam Simms denies the interview testified to by the Cashier as having taken place prior to the maturity of the note. But as the Cashier severed his connection with the Bank soon after this transaction and was not in its employ at the time his testimony was given, and as he has, therefore, no possible interest in this case, his statement necessarily is of greater probative value than that of a witness immediately interested.

It is a significant fact that the member of the defendant firm, Mr. James M. Simms, who affixed the firm's signature to the note, did not testify at all in the cause, and his absence is in no manner accounted for. Equally significant is the fact that the senior member of the firm is not interrogated and, therefore, does not testify concerning the alleged unauthorized employment of the defendant firm's signature affixed to the note by his son and co-partner, James M. Simms, or to the fact that the note was not executed for a partnership transaction. The sole testimony on this point is that of Mr. Sam Simms, and it is found solely and alone in answer to an interrogatory in chief as follows:

"Q. Mr. Simms, did your firm ever receive any benefit from the signing of this note?

"A. No, sir."

It is a well settled principle of law that the borrowing of money and negotiation of bills and notes are incident to and usual in the business of a co-partnership formed for the purpose of trading, and that where a co-partner borrows money professedly for the firm and executes therefor a negotiable instrument in the co-partnership name, it will bind all the partners, whether the borrowing were really for the firm or not, or whether he diverts or misapplies the funds or not, provided the lender is not cognizant of the intended fraud.

The burden of proving the fraud and that the lender was cognizant of said fraud (both of which must exist to discharge the co-partnership) is not upon the lender but upon the co-partnership.

"It must be regarded as the general presumption of law," says Mr. Parsons "that all paper upon which the signature of

the firm has been put by a partner is the paper of the partnership, and that all transfers of said paper by him are lawful. This, therefore, would call on the partnership to discharge itself and therefore would lay the burden of proof on them." Parsons on partnership, Sec. 134—"A note given by one of the several partners in the name of the firm is, of itself, presumptive evidence of the existence of a partnership debt, and if the other partners seek to avoid its payment, the burden of proof lies upon them to show that the note was given in a matter not relating to the partnership business, *and that the payee had had knowledge of such fact.* The fact of good faith between the parties or that the name was used as a joint undertaking in the regular course of business is presumed; that is, the note is taken to be what it purports to be, and the burden of proof is on defendants, the partners, to show the contrary."

Eaton and Gilbert On Commercial Paper, p. 109.

"Though a note be made by one of a firm in the firm's name out of the usual course of business, yet if it be signed by them or be made payable to them or order, or it be endorsed by one of them in the firm name and then discounted or transferred to a bona fide holder, all the partners are responsible on the note." Ibid, p. 115.

"If the firm's business is such that the making of any note is in its scope, a bona fide buyer can hold the firm and need not inquire whether the note was issued within the scope of the business or not, or whether it was to pay or secure a separate debt of a partner, or was for accommodation of a third person, or for a loan to the signing member or in any way in fraud of the right of the partnership."

Bates on Partnership, Section 352.

In Gansevoort vs. Williams, 14 Wend., N. Y., 123, Nelson, J., speaking in this case of the reason for the rule holding members of a firm liable to a bona fide holder of the firm's note executed or endorsed by one of them, says:

"It may be asked why should the parties be bound at all when the paper is in fact signed without their authority? This is no doubt against general principles and involves the injustice of subjecting a person to answer for an act of another to which he never expressly or impliedly assented. The answer is found upon the law merchant. By entering into the partnership which

reposes confidence in the other and constitutes him a general agent as to the partnership concerns, and the inconveniences to commerce if it were necessary that the actual consent of each partner should be obtained, or if it should be ascertained that the transaction was not for the benefit of the firm in the ordinary transaction of their business, suggested the rule that the act of one when it has the appearance of being on behalf of the firm is considered the act of the rest, and whenever a bill is drawn, accepted or endorsed by one of several partners on behalf of the firm during its continuance, which comes into the hands of a bona fide holder, the partners are liable to him, though in truth one partner only negotiated the bill for his own benefit without the consent of the co-partners.''

See also Daniel on Negotiable Instruments, par. 337.

Cottam vs. Smith, 27 An. 128:

''By the commercial law every member of a commercial firm can bind the others by drawing or indorsing commercial paper. If by an agreement inter se a different rule were established by commercial partners, it would be without effect against third parties, unless it were that such third party had knowledge of that agreement.

''The answer was a general denial. One of the partners (B) subsequently filed a separate answer. In this answer it was alleged that the promissory note sued on was indorsed,'' 'G. H. S. & Co.,' without authority from the commercial firm of G. H. S. & Co.; that said note was not given or indorsed by authority of said commercial firm. The note it seems was drawn by J. B. E. to the order of G. T. R. and by him indorsed by G. H. S. & Co.'' The partnership was held liable.

Walworth vs. Henderson, 9 An. 339:

''The defense was that the note upon which the judgment was rendered purports to have been executed by John Henderson & Co., but was so executed without any authority from the defendant, or for any consideration relating to the business of the firm of which defendant was a member. The note on which the judgment was rendered was given in renewal of another note given by John Henderson & Co. to the order of T. J. G., and discounted by the Planters' Bank for B. L. & Co., of Natchez, on their indorsement. It is immaterial whether the note was given G. for an indebtedness to him of the firm of

J. H. & Co., or whether it was thus executed for the accommo-
dation of Green, as would seem most probable from the fact that,
when it was taken up by the note given in renewal on which
the defendant was sued, the name of Green was first signed to
the note, and other evidence. Conceding that to be the fact,
which would be our conclusion from the evidence, and that
the name of the partnership was expressly used by one of the
partners without any authority in business not relating to the
firm, yet the rule is undoubtedly that the firm is bound jointly
to any bona fide holder of a note or bill of exchange which
has been drawn, executed or indorsed by any of the partners
in the name of the firm. The original note was that of J. H.
& Co., which went into the hands of B. L. & Co. in the usual
course of business, and was discounted by the bank, and the
note given in renewal was equally binding on the firm.''

In Bank of Louisiana vs. Kenner, 1 La. 398, the Court said:

''According to the authority it might appear doubtful
whether the signature of the company's name would bind all the
partners in solidum, unless it should be signed by some particular
member authorized by the contract of association to use the name
of the firm. But, on looking at the decisions referred to, it
appears to us that the matter is made clear that an obligation
in solidum is imposed on all partners by the use of *nomen
sociale* by any one o fthem.''

Joyce on Defenses to Commercial Paper, Sec. 90:

''So, where a partnership was formed for the purpose of,
and was engaged in, selling and buying, an instruction, in an
action upon a note executed by one of the partners in the firm
named, that, if the other partners did not authorize the note to
be so executed or did not subsequently ratify it, he was not
bound, is erroneous. And, though the name of a firm be affixed
by one of the members to negotiable paper for the accommoda-
tion of a third person, if the note is discounted by a bank
without knowledge of such fact, the other members of the
firm are liable, though the note is given out of the course of the
partnership business, and without their knowledge or consent.''

Quoting Waldo Bank vs. Lumbert, 16 Maine, Catskill Bank
vs. Stall (N. Y.), 15 Wend. 364.

''The ostensible power of a partner raises a sufficient impli-
cation to bind the firm, and, where a firm note is executed or

—317—

transferred by one of the partners, it will be no defense to any action thereon in the hands of one who is a bona fide holder for value and without notice that the note was given for the purpose other than partnership business, and that the partner, therefore, acted without authority. So it had been declared to be well settled that a general partner in a trading business may borrow money for the benefit of the firm and execute notes or draft therefor, unless restrained by the articles of co-partnership, of which the lender had notice, and that where money is borrowed by the partner of a trading firm in the name of the firm, and the note is executed therefor, such note is *prima facie* the obligation of the partnership; and, if the other partner seeks to avoid its payment, the burden of the proof lies upon him to show that the note was given in a manner not relating to the partnership business, and that also with the knowledge of the holder of the note. And this rule applies in the case of an accommodation note which has been given by one partner in the firm name."

Quoting Deitz vs. Regnier, 27 Kansas, 94; Chemung Bank vs. Bradner, 44 N. Y. 680; Austin vs. Vandemark, 4 Hill (N. Y.), 259; Catskill Bank vs. Stall, 15 Wend. 364; Leach vs. Bank, 2 Ind. 288; Waldo Bank vs. Lumbert, 16 Maine, 416.

In our opinion the defendant firm has not shown, with sufficient certainty, that the note sued on was not given in a matter relating to the partnership business and still less is there any evidence that the plaintiff—even if it were conceded that the note was not so given—had any knowledge of such fact or was in any manner put on inquiry.

It is contended by the learned counsel for the defendant that the Bank *was* put on inquiry from the facts appearing on the face of the papers and by reason of its usual course of dealings with the defendant firm. The argument is that the Bank had for many years been discounting notes for the defendant firm, which notes were executed by purchasers of mules, the defendant firm being the endorsers of such notes, whereas in the instant case, which is shown to have been the first of any similar transaction, the defendant firm appears as a maker of the notes. There is no force whatsoever in this contention. The course of dealing between the Bank and the defendant firm has been that of borrower and lender, the bank being the lender

on commercial paper furnished by the defendant firm.

The fact that in this instance the firm was a maker, instead of an indorser on a negotiable instrument tendered for discount, could no more put the Bank on inquiry than if the firm's note had been tendered with some third person's endorsement or with other collaterals attached and pledged therefor.

We are of opinion, therefore, that the defendant firm is liable on this note.

So far as concerns the reconventional demand, the appellee has filed no answer to this appeal, and does not therefore complain of the amount awarded against him, nor do we find any reason for increasing the damages in favor of the appellant.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and the same is hereby affirmd.

April 30, 1909.

Rehearing refused May 17, 1909.